UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARTA BARANY,

          Plaintiff,

    v.

COUNTY OF CONTRA COSTA, et al.,

          Defendants.

Case No. 25-cv-07446-EMC

**ORDER GRANTING IN PART MOTION TO DISMISS; REMANDING**

Docket No. 21

This case concerns the tragic death of Jazmin Pellegrini at age fifteen. Her mother, Plaintiff Marta Barany, alleges that Defendant Contra Costa County's inaction led to her daughter's death. She brings a federal due process claim under Section 1983 and state tort claims for negligence and breach of mandatory duties. For the reasons stated below, the County's motion to dismiss the federal claim is **GRANTED**. The state claims are **REMANDED** to Contra Costa County Superior Court.

## I.  BACKGROUND

### A.  Factual Background

Jazmin Pellegrini's family came to the United States from Hungary when Jazmin was ten years old. Dkt. No. 16, Second Amended Complaint (SAC) ¶ 59. The family emigrated to remove Jazmin from the reach of her grandfather, who had sexually abused her from the time she was two. *Id.*

Early Referrals to Children & Family Services

In 2021, Contra Costa's Children & Family Services (CFS) division received multiple referrals regarding Jazmin's sexual assault by her grandfather. SAC ¶ 25, 29; CFS 2022

Investigation, Dkt. No. 23-3 at p. 22. On each occasion, CFS determined the report did not call for an investigation. Dkt. No. 23-3 at p. 22. This was likely because Jazmin's grandfather remained in Hungary and was no longer physically present in Jazmin's life. *Id.* at p.5; SAC ¶ 59.

In March of 2022, CFS received another child endangerment report for Jazmin. SAC ¶ 30. This report concerned an incident in which Jazmin was taken to the hospital with a stab wound. *Id.* According to interviews with Jazmin's family, the night of the stabbing, "Jazmin was attempting to slit her sister[]'s throat with a pocket knife." Dkt. No. 23-3 at p.2. Plaintiff came in to stop her, and Jazmin was stabbed in the confrontation. *Id.* at 10. Plaintiff admitted to stabbing Jazmin, but other members of the family told CFS that Jazmin had stabbed herself and that Plaintiff had lied to try to protect Jazmin. *Id.* at 8.

After the 2022 stabbing, CFS social worker Defendant Wilks followed up multiple times with the family. Dkt. No. 23-3 at p.14. The family told Defendant Wilks that Jazmin was growing aggressive with her family, not taking her medication, and threatening self-harm. *Id.* p.15. She was hospitalized on multiple 5150 holds. *Id.* Defendant Wilks learned that Jazmin was no longer allowed to attend her high school in-person and was taking classes from home. *Id.* p.19, 21. Defendant Wilks concluded that Jazmin's parents were not abusing her and were engaging with various social services to help her. *Id.* at p. 25-26. Defendant Wilks closed her investigation, but expressed concern about Jazmin's mental health needs, which she described as "extensive" and "ongoing." *Id.* at p.26.

In 2023, CFS and Defendant Wilks investigated further child abuse referrals concerning Jazmin. SAC ¶ 45; CFS 2023 Investigation, Dkt. No. 23-4 at p.2. Plaintiff told Defendant Wilks that Jazmin was receiving counseling services through a Seneca therapist, who she saw weekly, as well as a school counselor, *id.* at p.5, and that there were therapists and caseworkers coming to the house regularly, *id.* at p.6. Jazmin's therapist from Seneca told Defendant Wilks that Jazmin had been hospitalized in October and November of 2022. *Id.* at p.9-10. The October hospitalization occurred after an attempted kidnapper gave Jazmin meth. *Id.* Defendant Wilks found that Jazmin had been hospitalized or put on 5150 at least twelve times since March of 2022. *Id.* p.10.

Defendant Wilks again concluded that the allegations of physical and emotional abuse to

Jazmin were unfounded. *Id.* p. 13. She found that there were "no current concerns for the children's safety while in the mother and father's case and custody" and no need for CFS intervention at the time. *Id.* Defendant Wilks wrote that "[t]here is concern for Jazmin's mental health needs that needs to be addressed by the mental health system and not child welfare. At this time, there is no child welfare concerns that require intervention. The mother and stepfather are making every effort to support Jazmin and ensure the other children are safe and supported." *Id.* p.14. Defendant Wilks noted that Jazmin had made frequent self-harm statements, had cut herself, and had admitted to lying to the hospital to be released. *Id.*

### 2024 Hospitalization and Protective Custody Warrant

On March 26, 2024, Jazmin tried to kill herself by running into traffic. SAC ¶ 53. After she was hit by a car and found naked in a public restroom, she was hospitalized at Sutter Center for Psychiatry. *Id.* The treatment team memorialized that home discharge would be unsafe because she would immediately leave and seek high-risk substances and relationships. *Id.* Plaintiff told the hospital that she could not keep Jazmin safe at home and refused to pick her up from the hospital. *Id.* at ¶¶ 53, 56. Plaintiff signed a letter authored by CFS stating that the family could not keep Jazmin safe and asking the County to take action. *Id.* ¶ 57.

On April 10, social worker Defendant Misty Mathiasen submitted a protective custody warrant for Jazmin. *Id.* ¶ 59. The custody warrant application reported that Plaintiff had told CFS that she was no longer able to keep Jazmin safe and refused to pick her up from the hospital. *Id.* 59. Plaintiff stated that Jazmin was being placed on 5150 holds weekly and running away shortly after being released from the hospital each time. *Id.* She reported that Jazmin had not attended school for over two years and that she was cutting, burning, and piercing herself, and selling her body for money and drugs. *Id.* Jazmin confirmed with hospital staff that she was selling sex for money and drugs. *Id.*

The court issued a Protective Custody Warrant, finding that Jazmin was in danger of physical or sexual abuse, and no reasonable means existed to protect her without removal from her home. *Id.* ¶ 60. On April 10, Jazmin was discharged to CFS care with a recommendation for residential treatment. *Id.* ¶ 58. CFS placed Jazmin in a short-term receiving center. *Id.* ¶ 62, 64.

3

Jazmin ran away from the receiving center that same day. *Id.* ¶ 63.

Two days later, on April 12, 2024, Jazmin was found at a gas station acting erratically. *Id.* ¶ 64. She was admitted on a 5150 hold to the County-run Contra Costa Regional Medical Center (CCRMC). *Id.*

On April 13, 2024, CCRMC contacted social worker Defendant Nicole Martinez, reporting Jazmin's location and hospitalization. *Id.* ¶ 65. Defendant Martinez told CCRMC that CFS did not have legal custody of Jazmin and "emphasized that parents have legal guardianship." *Id.* ¶ 65.

Jazmin told the hospital staff that she had been drugged and raped at gunpoint. *Id.* ¶ 64, 75. On April 16, CCRMC clinicians certified Jazmin as gravely disabled under the Lanterman-Petris-Short Act. *Id.* ¶ 76. CCRMC initiated an intensive bed search but was told that there were no accepting adolescent beds. *Id.* ¶ 77. Jazmin told her Social Worker Melanie Raquel that she could not go home, would run away from home, and would go "anywhere." *Id.* ¶ 78.

Discharge and Death

On the morning of April 17, Defendant Dr. Ferrer was assigned to Jazmin as treating physician, replacing the prior providers. *Id.* ¶ 83. He recorded a mental status exam, in which he found no suicidal ideation or intent, no psychosis, normal affect, and "logical" though process, but listed Jazmin's insight and judgment as "impaired." *Id.* ¶ 81; Jazmin's CCRMC Medical Record, Dkt. No. 23-6. He listed her danger to self as low to moderate. Dkt. No. 23-6 at p. 3. The clinical notes described Jazmin as "Initially agitated and with significant behavioral disruption for several days. Now 48 hours of calm and engaging behavior. High chronic risk of harm and continues to be likely to use meth on discharge, however no longer holdable and has not appeared to benefit from multiple inpt psych stays. Spoke with family who have guardianship about their ongoing collaboration with CFS and consideration for residential care." *Id.* at p.4. Defendant Dr. Ferrer's discharge note stated that that Jazmin had "no acute events yesterday or today," that she "continues to have provacative [sic] statements around using drugs after discharge, but no longer behaviorally disruptive or endorsing SI/HI" and "no psychosis." *Id.* at p.2. It stated that Jazmin's family was "willing to take her back and can pick her up tonight after securing the house for safety by removing knives and more." *Id.*

Jazmin was discharged to her family on the evening of April 17. SAC ¶ 94. Upon arrival at home, Jazmin refused to enter and ran away. *Id.* ¶ 95.

Minutes later, Contra Costa County Sheriff Deputies Defendants Michael Santos and Alexander Sullivan-Guzman encountered Jazmin in an alley near the home. SAC ¶ 96. Jazmin was barefoot and disoriented. *Id.* ¶ 96. Jazmin's family arrived at the scene and told the deputies that Jazmin had just been discharged from a psychiatric hospital and was a danger to herself. *Id.* The deputies mocked the family, describing Jazmin as "crazy" and "on drugs." *Id.* The deputies allowed Jazmin to leave and took no further action. *Id.* ¶¶ 66-101. Despite telling the family that they would file a missing person report, they did not do so. *Id.* ¶ 96.

Three days later, on April 20, 2024, Jazmin was found on the streets half-naked and deceased. *Id.* ¶ 103. She was fifteen years old. *Id.*

### B. Procedural Background

This case was originally filed in Contra County Superior Court. Dkt. No. 1. The County removed the case to federal court on September 3, 2025. *Id.* On September 9, the County filed a motion to dismiss. Dkt. No. 8. Plaintiff opposed but then stipulated to filing a second amended complaint. Dkt. No. 14. The SAC lists six counts: (1) Civil Rights Violations (42 U.S.C. § 1983); (2) Monell-Related Claims (42 U.S.C. § 1983);[1] (3) Negligence/Negligence Per Se; (4) Negligent Hiring, Supervision, or Retention (5) Breach of Mandatory Duty; (6) Wrongful Death (Code Civ. Proc. § 377.60). Defendant moved to dismiss on all counts, or in the alternative, to dismiss the federal claim and remand the state claims. Dkt. No. 21.

### C. Judicial Notice

Courts may take judicial notice of a fact "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be

---

[1] Although stated as separate counts, *Monell* is a theory of entity liability, not a separate claim for relief. Plaintiff only asserts a single federal claim for relief under Section 1983.

5

questioned." Fed. R. Evid. 201(b).  Public records are appropriate matters for judicial notice. *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) (taking notice of matters of public record outside the pleadings).

The Court can also consider documents outside the pleadings through the incorporation by reference doctrine, which is a "judicially created doctrine that treats certain documents as though they are part of the complaint itself." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018).  This doctrine permits a defendant to incorporate a document into the complaint "where the complaint necessarily relies upon a document or where the contents of the document are alleged in a complaint, the document's authenticity is not in question, and there are no disputed issues as to the document's relevance." *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *see also Guercia v. Affinity Ins. Servs.*, No. 4:24-cv-05088-MKD, 2025 U.S. Dist. LEXIS 8113, at *12 (E.D. Wash. Jan. 15, 2025) (incorporation by reference prevents plaintiff from "cherry- pick[ing]" and engaging in "misleading argumentation").  While "incorporation by reference generally permits courts to accept the truth of matters asserted in incorporated documents," it is "improper to do so only to resolve factual disputes against the plaintiff's well-pled allegations in the complaint." *Khoja*, 899 F.3d at 1014.

Defendant requested judicial notice of the following documents, Dkt. No. 22:

- Exhibit A: Investigation Narrative – CFS Referral Dated 5/28/2022
- Exhibit B: Investigation Narrative – CFS Referral Dated 1/17/2023
- Exhibit C: Screener Narrative – CFS Referral Dated 2/19/2023
- Exhibit D: ER Medical Record re: Jazmin Pellegrini
- Exhibit E: Marta Barany's Government Claim Against the County of Contra Costa, Received October 11, 2024
- Exhibit F: Notice to Claimant, Dated November 12, 2024
- Exhibit G: Marta Barany's "Amendment" to Government Claim Against the County of Contra Costa, Received February 26, 2024
- Exhibit H: Notice to Claimant of Late-Filed Amended Claim, Dated February 28, 2024
- Exhibit I: Children and Family Services Handbook, Excerpts

6

Plaintiff does not object to the Court taking judicial notice of Exhibits E-I as public records. Dkt. No. 27. Judicial notice of these exhibits is granted as public records.

Plaintiff objects to the Court taking judicial notice of Exhibits A-D, on the grounds that Decedent's juvenile case file records are confidential and thus not public records. Dkt. No. 27. However, for these records, Defendants assert that they seek judicial notice under the incorporation by reference doctrine. Dkt. No. 29. Plaintiff relies substantially on the content of CFS's investigations and the knowledge of Jazmin's situation that CFS gained through these investigations in asserting the claims in her Complaint, making these Exhibits A-C subject to incorporation by reference. SAC ¶¶ 25-30 (describing child endangerment reports received by CFS concerning Jazmin); ¶ 45 (describing and quoting from the contents of CFS reports). Exhibit D, Jazmin's ER Medical Record, is also subject to incorporation by reference, since Plaintiff quotes directly from, summarizes, and relies on this record. SAC ¶ 81.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a cause of action for failure to state a claim for relief. To overcome a Rule 12(b)(6) motion after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). "[A]llegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer

possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

The court does not accept allegations contradicted by facts and documents subject to judicial notice or incorporated by reference. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

### III.    DISCUSSION

#### A. Section 1983 Due Process Claim

"[T]he general rule is that [a] state is not liable for its omissions." *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 971 (9th Cir. 2011) (citing *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000)). The Fourteenth Amendment's Due Process clause does not provide a right to government aid, even when this aid is needed to secure life. *Id.* "There are two exceptions to this rule: (1) when a special relationship exists between the plaintiff and the state (the special-relationship exception); and (2) when the state affirmatively places the plaintiff in danger by acting with deliberate indifference to a known or obvious danger (the state-created danger exception)." *Id.* at 971-2 (citations omitted). A plaintiff can bring a Section 1983 claim based on the state's failure to act only if one of these two exceptions applies. *Id.* at 972.

1. Special Relationship

The special-relationship exception "applies when [the] state 'takes a person into its custody and holds him there against his will.'" *Patel*, 648 F.3d at 972. " 'Custody' for the purposes of the special-relationship exception is a restriction on the plaintiff's liberty that limits the ability of the plaintiff (or the plaintiff's parents) to meet the plaintiff's basic needs (e.g., incarceration, institutionalization, foster care)." *Murguia v. Langdon*, 61 F.4th 1096, 1110 (9th Cir. 2023); *Henry A. v. Willden*, 678 F.3d 991, 1000 (9th Cir. 2012) ("It is also clearly established that this special relationship doctrine applies to children in foster care"). "Under this exception, the state's constitutional duty arises 'not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which [the State] has imposed on his freedom." *Patel*, 648 F.3d at 972 (citing *Deshaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989)). The rationale is straight-forward: "[A] state cannot restrain a person's

8

United States District Court
Northern District of California

liberty without also assuming some responsibility for the person's safety and well-being." *Id*.

"The special-relationship exception does not apply when a state fails to protect a person who is not in custody." *Id*. at 972. In *DeShaney*, the Supreme Court ruled that the special relationship exception did not apply when a boy was beaten to death by his abusive father, because although the state had "extensive information strongly suggesting abuse," he was in the custody of his father at the time of his death. *Id*. "That the State once took temporary custody of [the boy] [did] not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter." *Deshaney*, 489 U.S. 189, 201 (1989).

"In evaluating whether the special relationship exception applies, the critical question is the level of restraint that a state has imposed on an individual's liberty." *Wyatt B. v. Kotek*, 146 F.4th 1267, 1276 (9th Cir. 2025). A special relationship may be found even when the state lacks physical custody where it exerts "control over virtually all aspects of a child's life through wardship and legal custody" and the child's "biological parents have been stripped of the rights they might otherwise have, including, but not limited to, the right to provide the child with care, education, discipline, and the right to authorize medical care for the child." *Id*. at 1276-77 (9th Cir. 2025). "[S]ome evaluation of state law is not only permissible but also necessary in determining whether a special relationship exists." *Id*. at 1276.

In California, a proceeding to declare a child to be a dependent child of the court is commenced by a social worker filing a petition. Cal. Welf. & Inst. Code § 325. The juvenile court then holds a jurisdictional hearing. *Id*. § 334, § 355; § 356. If, at the jurisdictional hearing, the court finds that it has jurisdiction, it holds a dispositional hearing and takes evidence on the disposition of the child. *Id*. § 358. A child is deemed to have entered foster care on the date of the jurisdictional hearing, or 60 days after being removed from the physical custody of their guardian, whichever is earlier. *Id*. § 361.49.

Under Section 340, "[a] protective custody warrant may be issued without filing a petition" based on probable cause that the child is subject to the juvenile court's jurisdiction, that there is a

substantial danger to the safety of the child, and there are no reasonable means to protect the child's safety without removal.  Cal. Welf. & Inst. Code § 340(b).  Any child taken into custody under Section 340 "shall immediately be delivered to the social worker who shall investigate, pursuant to Section 309, the facts and circumstances of the child and the facts surrounding the child being taken into custody and attempt to maintain the child with the child's family through the provision of services." § 340(c).  A child removed based on a warrant under section 340, is placed in "temporary custody." *In re Ja.O.*, 18 Cal. 5th 271, 285 (2025).  California Rule of Court 5.670 states that "when a child is taken into custody through a protective custody warrant," "a detention hearing must be held as soon as possible, but no later than 48 hours, excluding noncourt days, after the child arrives at a facility within the county. . . If the hearing is not commenced within that time, the child must be immediately released from custody."

As an initial matter, the Court must consider whether Jazmin was a foster child at the time of her death.  If Jazmin was a foster child, it is "clearly established" that the special-relationship doctrine applies.  *See Henry A.*, 678 F.3d at 1000.  Plaintiff alleges that Jazmin was a "foster child under the temporary custody of Contra Consta County."  SAC ¶ 9.  Other than this single conclusory line, however, Plaintiff does not plead facts supporting that Jazmin was a foster or dependent child under California law at any point, including at the time of her death.  Plaintiff does not plead that any dependency petition was ever filed for Jazmin, that any jurisdictional hearing was held, or that any finding of dependence was made.  *See* Cal. Wel. & Inst. Code § 325; § 355; § 356; § 361.4.

Rather, Plaintiff appears to rely on the protective custody warrant issued on April 10.  But Plaintiff identifies no state law or authority that the issuance of such a warrant, which authorizes *temporary* custody, renders a child dependent without any further proceedings.  Plaintiff asserts that once a child is taken into temporary custody, "§ 309(a)(5) prohibits release of a child who 'has left a placement in which the child was placed by the juvenile court.'"  SAC ¶ 72.  But Plaintiff misstates § 309(a)(5), which is an exception to the requirement that a social worker with temporary custody of a child "shall immediately release the child to [the family's] custody."  Cal. Wel. & Inst. Code § 309(a).  This exception to a mandatory provision leaves the social worker

United States District Court
Northern District of California

with discretion to retain custody in such a circumstance, not a mandate. Nor can Plaintiff square her position that a protective custody warrant places a child indefinitely under the state's custody with California Rule of Court 5.670, which mandates the "immediate release[] from custody" of a child under a protective custody warrant if no detention hearing is held within 48 hours.[2] In short, no authority supports that the protective custody warrant issued on April 10 authorized anything other than temporary custody, which effectively expired after the 48 hours provided by the rules of court.

It is undisputed that on April 17, Jazmin was discharged from the CCRMC into her parents' care and was taken home by her parents. SAC ¶¶ 81, 95. Once Jazmin was discharged to her family, the state imposed no further restrictions on Jazmin's liberty or on her family's liberty to care for her. The temporary protective custody warrant issued on April 10 no longer had legal effect. The County did not have control or custody over Jazmin by virtue of that warrant, and irrespective of the warrant, there are no allegations suggesting that the County was in fact exercising any control over her at that point. Jazmin was thus no longer in the state's custody after her discharge on April 17 and thereafter, including three days later when she died. The state cannot be held liable for her death under the special relationship doctrine.

*DeShaney* makes clear that a prior period of state custody does not alter this analysis. Exercising custody over a minor does not render the state responsible for that minor after release, even if the minor is harmed in a way that is foreseeable at the time of release. This is because the constitutional duty arises only from the state's restriction of liberty, not "the State's knowledge of the individual's predicament"; that duty is lifted when any liberty restriction is lifted. *See Patel*, 648 F.3d at 972.

*Wyatt B. v. Kotek* does not apply. 146 F.4th 1267, 1276-77 (9th Cir. 2025). *Kotek*

---

[2] At oral argument, Plaintiff's counsel claimed that Rule 5.670 requires a social worker to file a petition within fifteen days of a protective custody warrant issuing. Counsel may have been misremembering section (a) of the rule, which provides that "If the social worker does not take the child into custody but determines that a petition concerning the child should be filed, the social worker must file a petition with the clerk of the juvenile court as soon as possible. The clerk must set an initial hearing on the petition within 15 court days." This provision leaves whether or not to file such a petition to the discretion of the social worker; it imposes no requirement that a social worker file a petition.

considered whether children who were legally wards of the state but physically placed with their biological parents were subject to a special relationship, such that they could benefit from a foster care class action settlement. The panel held that they were, because the state had assumed "control over virtually all aspects of a child's life through wardship and legal custody" and their "biological parents have been stripped of the rights they might otherwise have, including, but not limited to, the right to provide the child with care, education, discipline, and the right to authorize medical care for the child." *Id.* at 1276-77. Here, Jazmin was never subject to a petition to be declared a dependent child of the court, was never deemed a dependent child, and never entered foster care as a matter of law. She was removed from her parents' custody on a temporary warrant but was subsequently returned to them without any assertion of control over her at that point. Upon her return, her parents retained all of their legal rights over her. Her parents' physical and *legal* custody at the time of her death defeats the special relationship exception.

### 2. State-Created Danger

The state-created danger exception applies when "the state action affirmatively place[s] the plaintiff in a position of danger, that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced." *Johnson v. City of Seattle*, 474 F.3d 634, 639 (9th Cir. 2007) (internal quotations omitted). "In examining whether an officer affirmatively places an individual in danger, we do not look solely to the agency of the individual, nor do we rest our opinion on what options may or may not have been available to the individual. Instead, we examine whether the officers left the person in a situation that was more dangerous than the one in which they found him." *Murguia v. Langdon*, 61 F.4th 1096, 1111 (9th Cir. 2023) (citing *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000)). "The critical distinction is not . . . an indeterminate line between danger creation and enhancement, but rather the stark one between state action and inaction in placing an individual at risk." *Id.* (quoting *Penilla by & Through Penilla v. City of Huntington Park,* 115 F.3d 707, 710 (9th Cir. 1997)). In *DeShaney*, there was no state-created danger when the state returned the boy to his abusive father, because "[w]hile the State may have been aware of the dangers that Joshua faced in the free world,

12

it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Deshaney*, 489 U.S. at 201.

Plaintiff cannot point to any state-created danger in this case. Plaintiff alleges that the County discharged Jazmin into her family's custody, despite her family's repeated warnings that they could not adequately care for her mental health needs and Jazmin's own threats that she would run away if taken home. From this, the undeniable inference is that the County returned Jazmin to an unstable and unsafe situation. But the County did not create that situation or worsen it: as in *DeShaney*, the County "placed [Jazmin] in no worse position than that in which [s]he would have been had it not acted at all." *Deshaney*, 489 U.S. at 201. Upon her discharge, Jazmin was placed in the same circumstances with her family that she was in before the county took temporary custody.

Indeed, by discharging Jazmin into her family's care, the County arguably placed Jazmin into a better position than the one it first encountered her in: on the streets after attempting to run into traffic. Plaintiff compares Jazmin's position upon discharge to her family to her position while hospitalized on a 5150 hold or hypothetically placed in a secure residential bed,[3] but the relevant comparator under the state-created danger cases is not the potential better situation Plaintiff could have been in, had she remained in state custody: it is the position Plaintiff was in before the state first intervened.

Plaintiff's state created danger argument against the County Deputies fails for the same reason. According to Plaintiff's allegations, the County Deputies stopped Jazmin on the street, observed her distress, were informed by her family about her situation, and still let her walk away. In other words, the County Deputies left Jazmin where they found her: barefoot and distressed on the streets. Their conduct, as pled, appears heartless, but it did not expose Jazmin to any danger she was not already in. In *Wood v. Ostrander*, the Ninth Circuit found that the state-created danger exception applied when an officer impounded the car that a woman had been a passenger

---

[3] The County emphasizes that it is barred by statute from placing dependent minors in "nonsecure" facilities without the minor's or the minor's conservator's consent. *See Wilson v. County of San Diego*, 91 Cal. App. 4th 974, 981, 983 (Cal. App. 2001) (citing Cal. Welf. & Inst. Code § 206).

United States District Court
Northern District of California

in and left her "stranded" late at night in an unsafe area. 879 F.2d 583, 590 (9th Cir. 1989). The panel found the state-created danger exception satisfied because, had the officer not intervened, Wood would have been in a car and safe. Unlike in *Wood*, Jazmin was already in a precarious situation when the officers arrived; their non-intervention did nothing to worsen it. If anything, the deputies' brief stop appears to have allowed Jazmin's family to catch up with her after she initially fled her home.

Plaintiff argues that the deputies' misrepresentation to the family – telling the family they would file a missing person report but not doing so – "delayed other protective steps and deprived Jazmin of the rapid interagency response that a juvenile missing-person entry is designed to trigger." SAC ¶ 147. A state official's affirmative sabotage of emergency response measures can be sufficient to show a state-created danger. In *Penilla by & Through Penilla v. City of Huntington Park*, the Ninth Circuit held that police officers violated due process when they locked decedent, who was on the porch experiencing medical distress, into his house, and cancelled a neighbor's 911 call. 115 F.3d 707, 710 (9th Cir. 1997). The officers' actions violated due process because they made it impossible for anyone to provide the decedent with emergency medical care. *Id.* They affirmatively made it more difficult to obtain help. The allegations against the deputies here do not rise to this level. Here, the deputies' false reassurance and failure to act did not make it harder or impossible to receive help. Although their unfulfilled promise might conceivably have diminished the family's incentive to take independent action in seeking further aid, it did not make it impossible for the family, or anyone else, to seek or provide help to Jazmin. And unlike in *Penilla*, the deputies took no action that affirmatively put Jazmin at greater risk than she was in before encountering them. What they did was in the nature of an omission – failing to provide promised assistance.

Accordingly, Plaintiff has not plausibly pled the state-created danger exception. Because neither the special relationship nor state-created danger exception apply, Plaintiff cannot state a claim against any of the individual defendants under Section 1983.

3.    *Monell* Claim

14

Local governing entities can be sued under Section 1983 for their own unconstitutional actions, such as the implementation of an official policy. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). But *Monell* does not authorize a Section 1983 claim against a government entity when the Plaintiff has suffered no underlying injury from an official. *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986). "If a person has suffered no constitutional injury at the hands of the individual [] officer, the fact that the departmental regulations might have authorized the [alleged violation] is quite beside the point." *Id.* Because Plaintiff cannot state a 1983 claim against any individual officers, she cannot state a *Monell* claim against the County.

### 4. Supervisory Liability

Plaintiff also asserts a theory of vicarious liability against various County officials for the acts of other county officials. SAC ¶¶ 169-178. As above, if there is no underlying violation, there is nothing for a supervisor to be held liable for. Further, "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

### 5. Intimate Association

Plaintiff purports to assert as a separate ground for Section 1983 liability the liberty interest that she holds in the companionship and society of her child. Dkt. No. 25 at 15. Since Plaintiff cannot satisfy the special relationship or state-created danger exceptions, this claim also fails, despite the different constitutional basis. Moreover, the typical parental rights claim involves the government removing children from their parents, not declining to do so, as here. *Compare Morrison v. Jones*, 607 F.2d 1269 (9th Cir. 1979), cert. denied, 445 U.S. 962 (1980) (allowing Section 1983 claim where county removed Plaintiff's son from her on the grounds that Plaintiff was incapable of providing the special care her mentally ill son required).

\*\*\*

Plaintiff seeks to hold the County liable for failing to prevent the death of a child in

15

known, severe distress.  Rightly or wrongly, federal precedent bars a constitutional claim based on such inaction.  Plaintiff's Section 1983 claim is **DISMISSED**.

### B. State Law Claims

Plaintiff also brings state law claims for negligence, negligent hiring, breach of mandatory duty, and wrongful death.  Although styled as separate claims, each count asserts the same underlying theory: that the County breached its duty to Jazmin and is liable in tort for these breaches.  To bypass the state's tort immunity and succeed on these theories, Plaintiff must show a mandatory statutory duty that the County violated.  *Lawson v. Superior Court*, 180 Cal. App. 4th 1372, 1382 (Cal. 2010) (California public entity typically immune to tort liability unless statutory exception met).  Whether an enactment imposes a mandatory duty is a question of state law. *County of Los Angeles v. Superior Court*, 102 Cal. App. 4th 627, 639 (Cal. App. 2002).

Discretionary Supplemental Jurisdiction

When a court dismisses federal claims, it retains subject-matter jurisdiction and the discretion to exercise supplemental jurisdiction.  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).  But under § 1367(c)(3) a district court may decline supplemental jurisdiction when it "has dismissed all claims over which it has original jurisdiction."  And the court should usually decline to exercise supplemental jurisdiction when all the federal claims are dismissed before trial.  *Gini v. Las Vegas Metro. Police Dep't*, 40 F.3d 1041, 1046 (9th Cir. 1994).  "To decline jurisdiction under § 1367(c)(3), the district court must first identify the dismissal that triggers the exercise of discretion and then explain how declining jurisdiction serves the objectives of economy, convenience and fairness to the parties, and comity."  *Trs. of Constr. Indus. & Laborers Health & Welfare Trust v. Desert Valley Landscape & Maint., Inc.*, 333 F.3d 923, 925, 64 Fed. Appx. 60 (9th Cir. 2003).

The Court declines to exercise supplemental jurisdiction in this case.  Plaintiff's remaining state law claims all turn on whether various state and county laws and regulations create mandatory duties and whether the County breached these duties.  These determinations will

involve close examination of the California Welfare & Institutions Code, related County regulations, and related County handbooks and guidance. *See e.g.*, SAC at 206-222 (citing as basis for state liability the Welfare & Institutions Code, All County Letters, CDSS Manual of Policies and Procedures Division, the County Handbook, and the California Penal Code, etc.). As the Ninth Circuit has observed, family law is a "core" area of state sovereignty, such that federal courts employ "various doctrinal mechanisms" to "avoid" deciding "state-law domestic relations issues." *Latta v. Otter*, 779 F.3d 902, 913 (9th Cir. 2015). Given the early stage of this case, the fact that federal courts have no special competence in this area, the strong state interest in deciding matters of family law, and the fact that the Court's adjudication of the federal claim does not answer the legal questions necessary to resolve the state claims (*i.e.* whether any statute, regulation, or policy imposes a mandatory duty on the County that it is plausibly alleged to have breached), the Court finds that judicial economy and comity are best served by declining jurisdiction. Plaintiff's remaining state law claims are accordingly **REMANDED**.

## IV.    CONCLUSION

The County's motion to dismiss is **GRANTED** as to Counts I and II. Plaintiff's remaining state law claims, Courts III through VI, are **REMANDED** to Contra Costa County Superior Court.

**IT IS SO ORDERED**.

Dated: 2/4/2026

_____
EDWARD M. CHEN
United States District Judge